MARTIN PETERSON ET AL., APPELLANTS, V. KENNETH COOK
ET AL.. APPELLEES.

121 N. W. 2d 399

Filed May 3, 1963. No. 35375.

Robert V. Hoagland and George F. Johnson, for appellants.

Thurman G. Weddel, Julius D. Cronin, and Edward E. Hannon, for appellees.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

This action was brought by the appellants Martin Peterson, Elmer Richardson, George Doyle, and Raymond Gipson, as residents and taxpayers of Keya Paha County, Nebraska, against the appellees Kenneth Cook, Marvin Williams, Leonard McCormick, A. F. Rowan,

Jr., first and real name unknown, and Willard E. Snyder, the members of the Board of Education of Keya Paha County High School District, hereinafter referred to as the school district board, praying that an election held to issue bonds to build new school facilities be declared null and void and to enjoin the issuance of the bonds.

In the summer of 1961, certain persons connected with the State Department of Education advised that the facilities of the school district were not adequate for an accredited school. Thereupon a countywide citizens committee was organized in Keya Paha County to analyze and investigate the school facilities and recommend what, if anything, should be done. This committee conferred with Doctor Stoneham of the University of Nebraska, and an architect. On February 5, 1962, after an investigation and analysis, the citizens committee recommended to the school district board that new facilities be constructed to cost $320,000. It further recommended that the question of issuing bonds in that amount be submitted to the voters at an election to be held on March 16, 1962, and that there be one polling place in Springview, Nebraska, the county seat.

On February 16, 1962, the school district board voted to submit to the electors a bond issue in the sum of $320,000 at one polling place in Springview on March 16, 1962. The school district boundaries are the same as those of the county.

On Sunday, March 11, 1962, the whole area was subjected to a blizzard. Winds continued until sometime in midday on March 13, 1962. The witnesses are not in complete agreement as to whether there was snowfall after March 12, 1962, but it is clear that snow continued to blow and drift until March 13, 1962, or later.

On Wednesday, March 14, 1962, the wind had gone down considerably. According to most witnesses, Thursday, March 15, 1962, was a nice day and there was general agreement that election day, March 16, 1962, was

a mild, sunny day with some thawing. The state and federal highways in the county were opened by 5:30 p.m., March 15, 1962, and a considerable number of other roads were open also. Others remained snowbound.

More than 60 persons testified concerning the storm. A substantial number of electors who were wholly or partially isolated by drifts could not get out to vote. Others could have gone to the polls but they preferred to care for the livestock or perform other chores instead. In some instances certain members of the family home went when others, because of age and frailties or by reason of their desire to take care of their livestock or other duties, or merely from lack of interest, stayed at home. Some, with tractors and plows or other machinery, with difficulty, opened a way to the road and either went to the polls or, because of lateness of the hour, returned to attend to chores or other matters. In some instances electors arrived too late to vote. The testimony of the witnesses, as well as photographs in evidence, leaves no doubt as to the severity of the storm and the great depth of the drifts remaining thereafter. Most of the witnesses said it was as severe a storm as they had ever had in that vicinity. There were many drifts 10 to 15 feet high.

At the election 494 votes were cast of which 307 were in favor of the proposition and 184 were against it. The total votes at the general elections in that county in previous years were 917 in 1956; 762 in 1958; and 905 in 1960. At the primary elections there were 473 in 1954; 467 in 1956; 546 in 1958; 368 in 1960; and 498 in 1962.

The trial in the district court resulted in a judgment in favor of the defendants and appellees, holding the election was legally called and held, and denying the injunction.

The motion for new trial of plaintiffs and appellants being overruled they bring the cause to this court by appeal.

Appellants first contend the blizzard kept a sufficient number of electors from the polls to have changed the result of the election and assign error to the trial court in not nullifying the election because thereof.

Appellants cite Article I, section 22, of the Constitution of Nebraska, which states that all elections shall be free, and there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise. They follow this with a citation of numerous texts and cases holding that where electors were prevented from voting by intimidation, violence, fraud, mistake, negligence, or erroneous decisions of election officers or officials, such circumstances may in certain cases where the number of electors affected is sufficient to have changed the result, nullify the election. All of these cases involve interference by human beings. That such hindrance to orderly elections might under certain conditions vitiate them is quite obvious and needs no discussion. 29 C. J. S., Elections, § 220, p. 323.

Appellants argue that interference caused by an act of God should be held to nullify an election in the same manner as that caused by human beings. They contend also that with such bad weather preceding March 16, 1962, the school district board had notice that many electors would be unable to vote and that the board should have postponed the day of election. We have found only one case discussing the effect of bad weather upon elections and have been cited to none other. The case was State ex rel. School Dist. No. 56 v. Schmiesing, 243 Minn. 11, 66 N. W. 2d 20. The factual situation presented there was also a severe snowstorm that had rendered travel throughout the territory difficult and in some parts, according to the testimony, impossible. As a result the polls were never opened in 3 out of 10 rural districts. A few electors went to the closed polling places but were unable to vote because there were no officials present to receive their votes. The court in the cited case held that those who presented themselves

to vote and could not do so were insufficient in number to change the result. In regard to those electors, however, who were unable to get to the polls, the court in the cited case in discussing the situation, said: "The trial court found that the school election of February 20, 1953, was not invalid because of the fact that no voters appeared at certain polling places due to a severe snowstorm and blocked roads.

"The relators argue that the election could have been called by those charged with that duty under the statute at some other time of the year and thereby severe weather and the possibility of a snowstorm and blocked roads could have been avoided. * * * It is the prerogative of the survey committee and the superintendent to exercise their judgment and discretion in that regard, and the courts have no right to interfere with the exercise of that duty to the extent of passing upon their wisdom or lack of it in selecting a certain day in the future for voting. If the statute is otherwise complied with as to election requirements, if good faith has been exercised by the election officials so that thereby no one has been misled, and if the officials have not under the law failed to perform their statutory duties, then the date set will have to stand. State and national elections have fixed dates. No change therein can be made even after consulting the weatherman. Elections must of necessity be held in all kinds of weather. If an election is held in fact, it is valid, though there may have been interference * * * by the elements. The vote may be reduced thereby or the outcome changed, but qualified voters who fail to go to the polls to vote under the circumstances will be bound by the expressed will of those who do. Of course, natural conditions over which man may exercise control may prevent an election in fact, but we think that interference short of that may not be classed as jurisdictional.

"This must of necessity be the rule, or there would be no solid ground upon which candidate or voter could

stand, for endless confusion and uncertainty would otherwise result."

In the case before us in spite of the difficulties experienced, the number of votes cast compared favorably with those counted at the primary elections held in the county. In some areas of the county a considerable distance from Springview and in certain rough portions where roads were the worst, a smaller proportion of electors were able to vote than elsewhere. This will not however permit the courts to nullify the election. In the absence of fraud, the courts will not ordinarily consider the effect of votes not actually cast at an election or the effect of fixing of a particular time for an election which is allegedly more favorable to one side than the other. State ex rel. Hopper v. School District 13, 13 Neb. 466, 14 N. W. 382. It is generally held that courts will presume that all electors failing to vote at an election assent to the affirmative vote as shown by the returns. Treat v. DeJean, 22 S. D. 505, 118 N. W. 709; State ex rel. School Dist. No. 56 v. Schmiesing, *supra.* The contentions of the appellants with respect to the trial court's ruling that under the circumstances shown the election should not be nullified by it on account of the blizzard are without merit.

The appellants assert that the trial court erred in not holding section 10-703.01, R. S. Supp., 1961, was unconstitutional in that it granted the school district board authority to designate the polling places, and that the board did not abuse its discretion in designating only one such polling place.

"It is a well-settled rule, supported with practical unanimity by the authorities, that the general doctrine prohibiting the delegation of legislative authority has no application to the vesting in political subdivisions of powers to govern matters which are local in scope. * * * In addition to the most frequent exercise of this power, in the case of municipalities, this principle has been employed to sustain a delegation of powers ordinarily

exercisable only by the legislature to such subdivisions as township committees, park commissioners, school districts, and counties or county boards." 11 Am. Jur., Constitutional Law, § 223, p. 934. In McDougall v. Lueder, 389 Ill. 141, 58 N. E. 2d 899, 156 A. L. R. 1059, the court in discussing the delegation of power by the Legislature, said: "The Legislature may authorize others to do that which it cannot do itself in the carrying out of valid laws. * * * The power to make a law and the conferring of authority and discretion as to its execution, which authority is to be exercised under and in pursuance of the law, mark the true distinction between powers which the Legislature can delegate and those which it cannot delegate." We conclude that the Legislature in enacting a law may properly delegate to the governmental subdivisions involved the authority and discretion necessary to effectuate its execution.

Appellants complain that the Legislature by section 10-703.01, R. S. Supp., 1961, delegated to the school district boards the power to designate polling places without providing standards or guideposts. The appellants do not suggest what standards or guideposts were necessary. Establishing polling places is a detail only in the school election laws and is a means of carrying out the legislative enactments. If standards or guideposts are necessary to implement such details, statutes would be replete with them. School bond elections are necessary throughout the state and are carried out in districts which vary greatly in area and population. Highways, streams, and bridges limit communication between points differently in the several districts. The Legislature cannot be informed of conditions in all areas. It appears proper and necessary that establishing the location of polling places be delegated to authorities who are informed of local conditions. No power of broad legislation is involved. Section 10-703.01, R. S. Supp., 1961, is not unconstitutional because of its providing that the school board or board of education shall designate

the polling places at which the elections are to be held.

In the case before us the election involved the voters of one countywide district who were voting on a single issue. There is evidence that the courthouse at Springview was chosen as the place of holding the election in order that the voters could view the existing school facilities and examine the plans for those proposed. Another reason for providing one polling place was to save costs. The election was set for Friday when it was hoped many parents would come in to get their children who attended high school. Springview is the county seat near the center of the district. Complaint is made that at a general election a considerable number of polling places are provided. Whether several county commissioners or supervisors or other local officers are then chosen which might require polling places in different districts is not shown by the evidence. It would appear that most of the polling places designated at general elections would have been as inaccessible as Springview.

Appellants maintain section 10-703.01, R. S. Supp., 1961, speaks of polling places in the plural and that no authority was conferred on the school district board to designate one only. Section 49-802, R. R. S. 1943, provides in part: "Unless such construction would be inconsistent with the manifest intent of the Legislature; rules for construction of the statutes of Nebraska hereafter enacted shall be as follows: * * * (6) Singular words may extend and be applied to several persons or things as well as to one person or thing. (7) Plural words may extend and be applied to one person or thing as well as to several persons or things." Under a statute providing for a school district election which leaves the selection of the number and location of the polling places to the school board, its decision will be final unless it is clearly shown to be arbitrary and unreasonable. In the case before us no such abuse of discretion appears and the contention of appellants cannot be sustained.

Appellants contend the trial court erred in holding that the action of the school district board relative to the bond election was its own action. They maintain that the decisions were made by the citizens committee and thereafter forwarded by letter to a corporation that had contracted to buy the bonds that were to be issued. The necessary resolutions and proceedings were thereafter drawn by the corporation or its attorney and forwarded to the attorney for the school district board. The minutes of the school district board however show clearly the necessary steps were taken by it relative to calling the election. It is obvious that if the board in fact acted, it is immaterial that its action was in accordance with advice or recommendations previously received from others. No discussion of this aspect of the trial court's judgment is necessary. This error assigned by the appellants has no merit.

The last contention of the appellants is that the corporation which contracted to buy the bonds agreed to furnish the assistance of its attorney with respect to the election and the preparation of the necessary history of the proceeding. Appellants argue the corporation cannot practice law or hire lawyers to carry on the business of practicing law, and that the contract was against public policy and void. Appellants claim that for some reason this contract if illegal and void would affect the legality of the election. The contract shows that the corporation's attorney was to consult with the school district's attorney in that respect. If indeed the contract concerning the employment of attorneys was void, a matter which we do not decide, it was purely collateral and had nothing to do with the validity of the election. Chamberlain v. Grimes, 42 Neb. 701, 60 N. W. 948; Omaha & R. V. Ry. Co. v. Brady, 39 Neb. 27, 57 N. W. 767.

Finding no error in the rulings of the trial court, its judgment is affirmed.

AFFIRMED.