CORAL PRODUCTION CORPORATION, A COLORADO CORPORATION, AND KJJ CORP., A WYOMING CORPORATION, PLAINTIFFS AND THIRD-PARTY DEFENDANTS, APPELLANTS, V. CENTRAL RESOURCES, INC., DEFENDANT AND THIRD-PARTY PLAINTIFF, EXCO RESOURCES, INC., A TEXAS CORPORATION, AND PAUL ZECCHI, AN INDIVIDUAL PERSON, DEFENDANTS, AND JAMES P. CHONKA, INC., A DISSOLVED COLORADO CORPORATION, ET AL., THIRD-PARTY DEFENDANTS, APPELLEES.

730 N.W.2d 357

Filed April 20, 2007. No. S-05-564.

R.K. O'Donnell, of McGinley, O'Donnell, Reynolds & Edwards, P.C., L.L.O., and Steven F. Mattoon, of Matzke, Mattoon & Miller, for appellants.

Scot W. Anderson and Andrea Wang, of Davis, Graham & Stubbs, L.L.P., for appellees Central Resources, Inc., and Paul Zecchi.

Richard P. Marshall, Jr., of Scott, Douglass & McConnico, L.L.P., for appellee EXCO Resources, Inc.

Donald J. Tedesco for appellees Central Resources, Inc., Paul Zecchi, and EXCO Resources, Inc.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

HEAVICAN, C.J.

## NATURE OF CASE

This action arises out of disputes between oil and gas companies that were or are fractional working interest owners of oil and gas assets in Nebraska under a joint operating agreement (JOA). When Central Resources, Inc. (Central), the operator under the JOA, put all of its oil and gas assets up for sale, Coral Production Corporation (Coral) claimed it had a preferential right under the JOA to purchase Central's Nebraska assets. Central disputed this claim and sold 70 percent of its total assets, including its Nebraska assets, to EXCO Resources, Inc. (EXCO), without offering Coral an opportunity to purchase the Nebraska assets. All of Central's remaining assets had been sold 18 days earlier to a different company. EXCO later transferred overriding royalty interests in the Nebraska assets to Paul Zecchi, Central's chief executive officer.

Coral and KJJ Corp. (KJJ), which owned one-third of Coral's interests in the JOA, filed an action against Central, EXCO, and Zecchi to quiet title to Coral and KJJ's interests. Coral and KJJ alleged claims of breach of contract, fraud, and tortious interference, and claimed that their disputes were governed by Nebraska law.

The district court determined the parties agreed in the JOA that Texas law would govern their disputes and granted summary judgment to Central, EXCO, and Zecchi on Coral and KJJ's claims of fraud, breach of contract, and tortious interference. It also determined that the JOA did not apply to EXCO's transfer of overriding royalty interests to Zecchi.

We determine that Central's sale of all of its oil and gas assets fell within the parties' typewritten exception to the preferential-right-to-purchase provision of the preprinted JOA. However, we conclude that the district court erred in determining Coral's preferential right to purchase did not apply to overriding royalty interests. We reverse on that sole issue and affirm the district court's order of summary judgment in all other respects.

## FACTUAL BACKGROUND

Zecchi was president and chief executive officer of Central. Coral was formed by James P. Chonka, Lawrence B. Conyers, and James R. Weber. In 1993 or 1994, Conyers left Coral, and his one-third interest in Coral was transferred to another corporation, KJJ, that Conyers had started.

### JOINT OPERATING AGREEMENT

In 1988, Central and Coral entered into a joint venture agreement to purchase Nebraska oil and gas interests from Marathon Oil Company (Marathon). Coral agreed to furnish engineering and economic data to Central to arrive at a competitive bid, and Central agreed to use its resources to obtain partners and financing for the purchase.

In April 1989, Central closed on its purchase from Marathon. On the same day, Central entered into the JOA with Coral and two other corporate parties.

The JOA was the 1977 version of the model form 610 operating agreement developed by the American Association of Petroleum Landmen.[1] Form 610 has been used widely in the oil and gas industry since 1956.[2] The JOA designated Central as the operator of the properties with full control of all operations at properties covered by the JOA. Coral and the other two parties were designated as nonoperators. Central held a 30-percent "before payout" interest, and the other two parties held 45-percent and 25-percent "before payout" interests. Coral held a 10-percent "after payout" interest, which percentage was taken from Central's 30-percent interest.

An interlineation to the JOA provided that "where the interests of the Operator in the joint properties are sold, transferred, merged or consolidated into a non-affiliated third party, then the selection of a successor operator" was to be made by two or more nonoperators with a 65-percent interest in the assets covered by the JOA.

Article VIII, paragraph G, of the model form provided a preferential purchase right and exceptions to the right:

---

[1] See 2 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 19A.6 (1989).

[2] *Armstrong v. Tri-Valley*, 116 Cal. App. 4th 1375, 11 Cal. Rptr. 3d 412 (2004).

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell . . . . However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all or substantially all of its assets to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which any one party owns a majority of the stock, *or substantially all of the assets and/or stock of the selling party is sold to a non-affiliated third party. Refer to Article XV G. for additional provisions.*

The italicized language is the parties' typewritten interlineation to the model form. The exception to the preferential right to purchase in article XV, paragraph G, is not relevant to the arguments raised by the parties in this appeal.

Article I of the model form defines terms, and this portion of the form was not altered. Article I ends with this statement: "Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular . . . ." The model form portion of the JOA also provided that the governing law for any disputes under the JOA would be "the law of the state in which the Contract Area is located." However, article XV, paragraph E, of the added provisions provided that Texas law would govern any disputes between the parties.

In July 1989, Central and Coral entered into a "Purchase and Sale Agreement" that was intended to clarify the rights and obligations of both parties. The sale agreement stated facts leading up to the JOA and was retroactive to the date the JOA was executed. The sale agreement provided that Coral had assisted in the acquisition of the Nebraska properties and that Central desired to

sell approximately 70 percent of its interests in the Nebraska properties to third parties. Central promised that its remaining 30-percent interest would be divided with Coral under one of two plans.

Under "Plan A," Coral could pay Central $515,755 for 15 percent of Central's remaining interests. If Coral had not elected plan A by August 15, 1989, then Coral elected, by default, to exercise "Plan B." Under plan B, Central would assign 10 percent of its remaining interests to Coral and provide the collateral and security necessary to finance its entire interest until "payout." Payout was defined as the date that Central repaid its principal loan obligations and obligations to third parties. Central's assignment to Coral was effective within 120 days of the agreement but was conditioned upon the release of bank loans and the repayment of fees.

Central agreed to apply proceeds from the assets to its obligations in accordance with a prioritized list. The parties agreed that Central would be the operator of record and that Coral would be the contract pumper and field supervisor. Central also agreed that if Coral elected plan B, it would make good faith efforts to assist Coral to become the successor operator of specified properties within 60 days of payout and to cast its vote affirmatively for Coral.

At least by April 1990, the parties began having disputes. Coral questioned Central's low production and performance of operator duties, while Central questioned Coral's performance of field operations. In October 1990, Central removed Coral as the contract operator.

### Amendment

In November 1990, the parties executed an instrument entitled "Amendment to Agreements." It provided that Central had acquired "oil and gas interests including (but not limited to working interests, *overriding royalty interests*, and mineral interests) from Marathon." It also specifically listed the property rights Central had acquired, including: "1. Producing oil and gas leases [and] 2. Mineral, royalty and overriding royalty interests."

Central agreed in the amendment that although payout had not occurred, it would immediately assign to Coral 10 percent of its remaining 30-percent interest in the Marathon properties for a

purchase price of $162,842.66. The parties confirmed that they intended to be bound by the JOA and that the JOA was amended only to the extent that Central agreed to convey 10 percent of its interests to Coral before "payout" in exchange for the purchase price.

Coral exercised its option to purchase 10 percent of Central's interests. Over the next several years, Coral continued to question or express dissatisfaction with Central's performance of its operator and accounting duties.

## CENTRAL'S SALE OF ASSETS

In May 2000, Central issued a "Property Sale Memorandum" that offered for sale all of its oil and gas assets in five major packages: four regional packages and a separate package offering its royalty and overriding royalty interests in four states, including Nebraska. Some of the Nebraska assets were also sold in a subpackage of the "Mid-Continent" package. Bids were due by June 30.

Around May 23, 2000, Coral received a copy of Central's sale memorandum and was aware that Central intended to sell all of its oil and gas assets. On May 26, Coral sent a letter to Energy Spectrum, Central's agent in the sale of its assets. Coral asserted its preferential right to purchase some properties listed in the memorandum. In June, Coral submitted a bid on the subpackage with assets covered by the JOA and repeated its preferential purchase right regarding some of the assets in the subpackage and in the royalties package.

On August 13, 2000, Central sold its "Four Corners" regional package to Elmridge Resources, Inc., for $20 million. Central sold all of its remaining assets, including its Nebraska assets, to EXCO on August 31 for $48 million. The EXCO transaction closed on September 22, and the Elmridge transaction closed on September 29. The effective date for both sales was June 1, 2000. Also on September 22, Central paid off its loan for its Nebraska assets and had no remaining interests in Nebraska.

Before entering into the sale agreement with EXCO, Central and EXCO discussed whether Coral's preferential purchase right applied and determined that no parties to the JOA had a preferential purchase right because Central was selling substantially all

of its assets in its sale agreement with EXCO. Central did not notify any of the parties to the JOA of their preferential purchase right or notify them that the sale to EXCO had occurred until September 22, 2000. Coral had no knowledge that Central had closed on the sale of its assets until afterward. On September 26, Coral wrote to both EXCO and Central to demand notice of the value of all sold assets that Coral claimed were covered by its preferential purchase right.

The record indicates that on December 7, 2000, a notary public certified the parties' signatures on EXCO's transfer of overriding royalty interests to Zecchi. The transfer was effective June 1, 2000, and included overriding royalty interests in several oil and gas leases in Nebraska.

## PROCEDURAL HISTORY

### COMPLAINT AND ANSWER

Coral and KJJ filed their operative complaint against Central, EXCO, and Zecchi in October 2003. Coral and KJJ sought to quiet title to their interests under the JOA. They alleged that all the defendants had conspired to defraud Coral of its preferential purchase right under the JOA. Coral and KJJ alleged that Central had breached the JOA by failing to comply with the preferential-right-to-purchase provision and had breached the amendment to the agreements by failing to assist Coral to become the successor operator within 60 days of payout. Coral and KJJ alleged that before EXCO was a party to the JOA, it tortiously interfered with Coral's contract rights by intentionally procuring Central's breach.

Coral and KJJ alleged that after EXCO assumed Central's duties under the JOA, EXCO breached the preferential-right-to-purchase provision by transferring overriding royalty interests to Zecchi without first offering those interests to Coral. Finally, Coral and KJJ alleged that all the defendants conspired to defraud Coral of its preferential right to purchase the overriding royalty interests.

In March 2004, Central, EXCO, and Zecchi filed an answer, which included affirmative defenses and Central's counterclaim based on Coral and KJJ's alleged breach of the JOA.

## CHOICE OF LAW AND DISCOVERY SANCTIONS

In August 2004, upon Central, EXCO, and Zecchi's motion, the district court determined that the parties intended through the JOA's choice-of-law provision to have Texas law control substantive issues arising from the JOA. In the same order, the court granted Central, EXCO, and Zecchi's motion to compel the production of documents and ordered Coral and KJJ, as a sanction, to bear the costs and attorney fees for the retaking of a corporate deposition after the documents were produced.

## MOTIONS FOR PARTIAL SUMMARY JUDGMENT
## AND DISTRICT COURT'S ORDERS

From August 2004 to April 2005, the parties filed a series of motions for partial summary judgment. This case was decided by two separate orders of the district court ruling on these motions without comment. The orders were filed on April 8 and 20, 2005.

Central, EXCO, and Zecchi moved for partial summary judgment on Coral and KJJ's (1) fraud claims, (2) quiet title claim, (3) claims that Central had breached the JOA, (4) claim that Central had breached the amendment, and (5) claim that EXCO had tortiously interfered with Coral's contract rights. In addition, Zecchi and EXCO moved for partial summary judgment on their claim that the JOA did not cover EXCO's transfer of overriding royalty interests to Zecchi. The district court sustained all of these motions.

Coral and KJJ moved for summary judgment on Central's counterclaim that Coral and KJJ had breached the JOA, which motion was sustained. Coral and KJJ also sought an order that five pages of the JOA, which included both the printed and typewritten preferential right provisions, were unambiguous. This motion was also sustained; the court found the contract was unambiguous.

Coral and KJJ also sought rulings on these specific issues: (1) that a sale of substantially all of a party's assets or stock to "a non-affiliated third party" in the exception to the preferential-right-to-purchase provision included only single entities, (2) that Central's sale to EXCO was not a sale of "substantially all" of Central's assets, and (3) that EXCO's transfer of overriding

royalty interests to Zecchi was subject to the preferential-right-to-purchase provision. All of these motions were overruled. Finally, the court ordered Coral and KJJ to pay $6,000 in costs and fees in connection with its earlier discovery sanction for their failure to produce documents before a corporate deposition.

## ASSIGNMENTS OF ERROR

Coral and KJJ assign that the district court erred in (1) dismissing its quiet title action, (2) failing to find that Central breached the JOA by not offering Coral a preferential right to purchase assets sold to EXCO, (3) failing to find that Central committed fraud by deliberately concealing information regarding the sale of Central's assets to EXCO and EXCO's subsequent sale of overriding royalty interests to Zecchi, (4) finding that EXCO did not tortiously interfere with Coral's contract rights under the JOA, (5) finding that Central did not breach the amendment to the sale and purchase agreement, (6) failing to find that EXCO breached the JOA by not offering Coral a preferential right to purchase overriding royalty interests sold to Zecchi, (7) finding that Texas law governed disputes under the contract, (8) finding that the phrase "a non-affiliated third party" in the preferential-right-to-purchase exception of the JOA included "parties," (10) finding that Central's sale to EXCO constituted a sale of "substantially all" of Central's assets, and (11) failing to grant Coral and KJJ's motions for summary judgment.

## STANDARD OF REVIEW

█ Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[3]

█ The meaning of a contract and whether a contract is ambiguous are questions of law.[4] Which state's law governs an issue is a question of law.[5] When reviewing questions of law, an

---

[3] *City of Lincoln v. Hershberger*, 272 Neb. 839, 725 N.W.2d 787 (2007).

[4] *Kluver v. Deaver*, 271 Neb. 595, 714 N.W.2d 1 (2006).

[5] *Mertz v. Pharmacists Mut. Ins. Co.*, 261 Neb. 704, 625 N.W.2d 197 (2001).

appellate court has an obligation to resolve the questions inde-
pendently of the conclusions reached by the trial court.[6]

 The determination of an appropriate sanction under Neb.
Ct. R. of Discovery 37 (rev. 2000) rests within the discretion of
the trial court and will not be disturbed on appeal absent an abuse
of discretion.[7] An abuse of discretion occurs when a trial court's
decision is based upon reasons that are untenable or unreason-
able or if its action is clearly against justice or conscience, rea-
son, and evidence.[8]

## ANALYSIS

### GOVERNING STATE LAW

 Coral and KJJ argue that "this contract involves the *even-
tual* ownership of real estate interests in Nebraska and, therefore,
it should be governed by Nebraska law."[9] We agree that this court
has implicitly recognized that oil and gas leases have many of
the same components as real estate interests.[10] Moreover, this
court, like many states, has explicitly recognized that an interest
in an oil and gas lease is an interest in real property to the extent
that it grants the lessee the right to remove minerals from the
land.[11]

 This action, however, arises out of a dispute over the
meaning of the parties' executory promises in a joint operating
agreement. An operating agreement is the standard contract used
in the oil and gas industry to govern the rights and duties be-
tween the operator and nonoperator interest owners of oil and gas
tracts or leaseholds in the development and operation of mineral

---

[6] *Didier v. Ash Grove Cement Co.*, 272 Neb. 28, 718 N.W.2d 484 (2006).

[7] *Salazar v. Scotts Bluff Cty.*, 266 Neb. 444, 665 N.W.2d 659 (2003).

[8] *State v. Floyd*, 272 Neb. 898, 725 N.W.2d 817 (2007).

[9] Brief for appellant at 23 (emphasis supplied).

[10] *Long v. Magnolia Petroleum Co.*, 166 Neb. 410, 89 N.W.2d 245 (1958).

[11] See *Fawn Lake Ranch Co. v. Cumbow*, 102 Neb. 288, 167 N.W. 75 (1918).
Accord, *Kelly Oil Co. Inc. v. Svetlik*, 975 S.W.2d 762 (Tex. App. 1998);
*Thomas v Steuernol*, 185 Mich. App. 148, 460 N.W.2d 577 (1990). See, also,
1A W.L. Summers, The Law of Oil and Gas § 152 (1954).

properties.[12] " '[T]he agreement normally is not intended to affect the ownership of the minerals or the rights to produce.' "[13] Other courts have implicitly recognized that operating agreements create contractual rights, not property rights.[14]

Although Coral and KJJ sought a judgment establishing title to the interests covered by the JOA, it concedes that the "key issue in this lawsuit . . . which affects all of [Coral's] causes of action, is the proper construction of Article VIII(G) entitled 'Preferential Right to Purchase.' "[15] Even if successful, Coral's claim would have obligated Central to sell Coral and KJJ the interest sold to EXCO on the same terms.[16] But that determination would not have directly affected title to real property in Nebraska.

■ The Restatement (Second) of Conflict of Laws § 187(1) at 561 (1971) provides that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue . . . ." Because the dispute over Coral and KJJ's preferential purchase right involves a contractual claim to purchase property interests, rather than directly affecting title to Nebraska real property, the parties were free to choose Texas law to govern this claim, and the district court did not err in so determining.

### PREFERENTIAL-RIGHT-TO-PURCHASE EXCEPTION

Coral and KJJ contend that Central's sale of its oil and gas assets did not fall within the exception to the preferential right to

---

[12] See, *Akandas, Inc. v. Klippel*, 250 Kan. 458, 827 P.2d 37 (1992); Gary B. Conine, *Property Provisions of the Operating Agreement—Interpretation, Validity, and Enforceability*, 19 Tex. Tech. L. Rev. 1263 (1988); 2 Kuntz, *supra* note 1.

[13] *Akandas, Inc., supra* note 12, 250 Kan. at 466, 827 P.2d at 45.

[14] See, e.g., *Armstrong, supra* note 2; *IMCO Oil & Gas Co. v. Mitchell Energy Corp.*, 911 S.W.2d 916 (Tex. App. 1995). Compare *McMillan v. Dooley*, 144 S.W.3d 159 (Tex. App. 2004). But see *Producers Oil Co. v. Gore*, 610 P.2d 772 (Okla. 1980).

[15] Brief for appellant at 25.

[16] See *Winberg v. Cimfel*, 248 Neb. 71, 532 N.W.2d 35 (1995); *McMillan, supra* note 14.

purchase because the plain language of the exception shows a sale of a party's assets or stock to "a non-affiliated third party" does not include a sale to more than one nonaffiliated third party. Central, EXCO, and Zecchi contend that Coral and KJJ's interpretation of the exception clause conflicts with the rule of construction in article I of the JOA, which provides: "Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine."

Coral and KJJ counter that this court should decline to apply the rule of construction to the typewritten interlineation in the exception clause because (1) the rule of construction was only intended to apply to the definitions that were listed in article I; (2) interpreting "a non-affiliated third party" to include the plural would create an ambiguity; (3) other sections of the JOA show that the parties used the term "party" in the singular, plural, or in combination, to indicate their intent; and (4) interpreting the phrase to include the plural of "party" would render the preferential-right-to-purchase provision meaningless.

The construction of an unambiguous contract presents a question of law for an appellate court.[17] A court's primary concern in interpreting a contract is ascertaining the true intent of the parties.[18] If a written instrument can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe it as a matter of law.[19]

An appellate court must examine and consider the writing as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.[20] A court presumes the parties to a contract intend every clause to have some effect.[21] No single provision taken alone will be given

---

[17] *MCI Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647 (Tex. 1999).

[18] *XCO Production Co. v. Jamison*, 194 S.W.3d 622 (Tex. App. 2006).

[19] *McMillan, supra* note 14.

[20] *XCO Production Co., supra* note 18.

[21] *Id.*

controlling effect; rather, all provisions must be considered with reference to the whole instrument.[22]

Applying Texas' rules of construction, we disagree with Coral and KJJ's arguments. First, Coral and KJJ argue that under the rule of "ejusdem generis," because the definitions of terms in article I precede the rule of construction, the rule was intended to apply only to those definitions. Coral and KJJ misapply this canon of construction. " '[T]he rule of *ejusdem generis* . . . provides that when words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation.' "[23] In other words, general terms must be construed consistent with specific terms when they are used in a sequence.[24]

That rule has no application here because the rule of construction is not an undefined term and the terms defined in article I are unrelated to the rule. There are no other sections of the JOA providing rules of construction, so article I was the logical place to insert a rule directed at interpreting terms in the instrument. Moreover, the reference to "neuter gender" could have no application to the definitions listed in article I, supporting a conclusion that the rule of construction was intended to be global rather than limited to the listed definitions.

Second, we reject Coral and KJJ's contention that interpreting the exception clause to include the plural form of "party" renders the JOA ambiguous. The cases relied on by Coral and KJJ are distinguishable. For example, in a Texas case, the owners of adjacent commercial lots recorded an agreement to allow reciprocal parking on either lot, which would be binding on them and future owners "unless rescinded by the then *owner's* of said property."[25]

---

[22] *First Permian, L.L.C. v. Graham*, 212 S.W.3d 368 (Tex. App. 2006).

[23] *HILCO Elec. Co-op. v. Midlothian Butane Gas*, 111 S.W.3d 75, 81 (Tex. 2003).

[24] See *id.* See, also, *Dykes v. Scotts Bluff Cty. Ag. Socy.*, 260 Neb. 375, 617 N.W.2d 817 (2000).

[25] See *Harrison v. Bentley Express Ltd., Inc.*, No. 05-00-01794-CV, 2001 WL 1360206 at *1 (Tex. App. Nov. 7, 2001) (unpublished opinion) (emphasis supplied).

The court determined that the word "owner's" in this phrase created an ambiguity as to whether the parties had intended to allow one owner to unilaterally terminate the agreement or to require mutual consent.

In a Maryland case cited by Coral, the court reversed a defendant's conviction for threatening a prosecutor because, although a threat against a "State official" could include " 'a State's Attorney' " under the statute, the singular reference unambiguously precluded its application to a state attorney's appointed assistants.[26]

The reasoning in these cases is not applicable. First, Maryland courts, like most courts, strictly construe penal statutes.[27] Further, when a statutory scheme does include a rule of construction that allows a term's meaning to include its plural form, or vice versa, the opposite result has been reached.[28]

As in the statutory construction cases, no ambiguity results from applying the parties' rule of construction to the terms in the JOA. A contract is not ambiguous if it can be given a certain or definite meaning as a matter of law.[29] The rule of construction simply shows that the parties unambiguously intended the term "a non-affiliated third party" to have both a singular and plural meaning.

It is true that to the extent a conflict exists between typewritten and printed provisions, the typewritten matter in a contract must be given effect over the printed matter.[30] But "[b]oth a printed provision that is clearly a part of the body of a contract and a handwritten or typewritten provision that has been inserted into a contract are subject to the same rules of interpretation as are other provisions of a contract."[31]

---

[26] *Gillespie v. State*, 370 Md. 219, 224, 804 A.2d 426, 428 (2002).

[27] *Moore v. State*, 388 Md. 623, 882 A.2d 256 (2005).

[28] See, e.g., *Holley v. Grigg*, 65 S.W.3d 289 (Tex. App. 2001). See, also, *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001); *Peterson v. Cook*, 175 Neb. 296, 121 N.W.2d 399 (1963).

[29] *XCO Production Co., supra* note 18.

[30] *Friedrich v. Amoco Production Co.*, 698 S.W.2d 748 (Tex. App. 1985).

[31] 5 Margaret N. Kniffin, Corbin on Contracts § 24.24 at 262 (1998).

In order to harmonize provisions that appear to be in conflict, Texas courts will apply printed provisions to typewritten provisions unless specific language in the typewritten provision precludes that result.[32] For example, a proportionate reduction clause in an oil and gas lease allows the lessee to reduce royalties or other moneys owed the lessor under specified circumstances.[33] In Texas, whether a printed proportionate reduction clause applies to a typewritten rider or addendum reserving an overriding royalty interest depends upon whether the typewritten provision includes specific language showing that the parties did not intend for the overriding royalty interest to be reduced.[34]

Here, the interlineation in the exception clause shows the parties intended to narrow the preferential right to purchase and did not want the right to be triggered if one of them decided to exit the oil and gas business and sell its assets to a nonaffiliated third party. Nothing in the interlineation would preclude interpreting the phrase "a non-affiliated third party" to include its plural form. For instance, the parties did not state that the preferential right to purchase would not apply to a sale of a party's assets to "a *single* third party."[35] Texas courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained.[36]

Coral and KJJ counter that construing the exception as allowing a party to sell its assets to more than one outside party would permit a JOA party to sell a portion of its assets to an outside party and avoid the preferential right to purchase if the selling party intended to completely dissolve at some later point in time. There is no merit to this contention. Traditional contract principles would ensure that the owner of property subject to a preferential right to purchase "remains master of the conditions

---

[32] See *Horizon Resources, Inc. v. Putnam*, 976 S.W.2d 268 (Tex. App. 1998).

[33] See *Santa Fe Energy Oper. Partners v. Carrillo*, 948 S.W.2d 780 (Tex. App. 1997).

[34] *Horizon Resources, Inc., supra* note 32.

[35] See *El Paso Prod. Co. v. Geomet, Inc.*, No. 05-05-01085-CV, 2007 WL 80581 at *3 (Tex. App. Jan. 12, 2007) (emphasis supplied).

[36] *Tenneco Inc. v. Enterprise Products Co.*, 925 S.W.2d 640 (Tex. 1996).

under which he will relinquish his interest, as long as those conditions are commercially reasonable, imposed in good faith, and not specifically designed to defeat the preemptive rights."[37]

However, we need not decide that issue here because Central clearly intended to exit the oil and gas business when it placed all of its assets for sale at the same time. Although it sold the assets in packages, the property sale memorandum specifically provided that it would give preference to "offers for the entire company and/or multiple package offers."

As one commentator has noted:

> [R]arely will any party, particularly a corporation of substantial size and with diverse assets, be able to sell all of . . . its assets to a single purchaser, and . . . therefore, the parties may very well not have intended to use the phrase "sale of all assets" in the singular sense of a sale to one purchaser but rather in the plural sense indicating a mode or means by which titles are passed.[38]

Interpreting the JOA as a whole and giving effect to every provision, we conclude that the parties unambiguously intended that the preferential right to purchase would not be triggered by a party's sale of all or substantially all of its assets to one or more nonaffiliated third parties. The evidence shows that Central offered all of its oil and gas assets in one sale and that it had no remaining oil and gas assets after two sales agreements that resulted from that offer. Thus, the district court did not err in determining that Central had not breached the JOA.

Because we conclude that Central did not breach the JOA, we need not consider Coral and KJJ's claim that EXCO tortiously interfered with their contract rights by procuring Central's breach. Further, because the parties do not dispute that Central had no remaining assets covered by the JOA after these two sales, we need not consider whether Central's single sale to EXCO constituted a sale of all or substantially all of its oil and gas assets.

---

[37] *West Texas Transmission, L.P. v. Enron Corp.*, 907 F.2d 1554, 1563 (5th Cir. 1990).

[38] John S. Sellingsloh, *Nature and Purpose of Preferential Purchase Rights*, 11 Rocky Mtn. Min. L. Inst. 35, 40-41 (1966).

## Overriding Royalty Interests

The district court overruled Coral and KJJ's summary judgment motion that claimed the preferential right to purchase applied to the transfer of overriding royalty interests to Zecchi. It also sustained EXCO and Zecchi's motion for summary judgment on this claim but did not specify its reasoning.

Coral and KJJ assign that the district court erred in failing to find that after Central had sold its Nebraska assets to EXCO, EXCO's transfer of overriding royalty interests in the Nebraska assets to Zecchi triggered Coral and KJJ's preferential right to purchase those interests. This claim is not directed at Central. EXCO and Zecchi argue that because overriding royalties are nonoperating interests carved out of the working interests, they are not subject to the JOA.

Initially, we note that the agreement was made binding upon the parties' successors and assigns and required a JOA party to make any sales or transfers subject to the JOA. Thus, EXCO was bound by the JOA's preferential right to purchase, and it does not dispute this point.[39]

An overriding royalty interest is a fractional interest in the production of oil and gas, which is free of the costs of production and over and above any royalty interest payable to the lessor of an oil and gas lease. It is an interest retained by the lessee of an oil and gas lease, such as a speculator or oil and gas production company, when the lessee assigns all or part of its lease or allows another party to drill on a site covered by its lease.[40]

A working interest is an operating interest under an oil and gas lease that provides its owner with the exclusive right to drill, produce, and exploit the minerals.[41] Under Texas law, an overriding royalty interest "'is carved out of, and constitutes a part of, the working interest created by an oil and gas lease.'"[42]

---

[39] See *IMCO Oil & Gas Co.*, *supra* note 14.

[40] See, 3 W.L. Summers, The Law of Oil and Gas § 554 (1958); 8 Howard R. Williams & Charles J. Meyers, Oil and Gas Law 748 (2000).

[41] *H.G. Sledge v. Prospective Inv. & Trading*, 36 S.W.3d 597 (Tex. App. 2000), citing 8 Williams & Meyers, *supra* note 40.

[42] *Matter of GHR Energy Corp.*, 972 F.2d 96, 99 (5th Cir. 1992), quoting *Gruss v. Cummins*, 329 S.W.2d 496 (Tex. App. 1959).

EXCO and Zecchi rely on law review articles for their proposition that because the owner of an overriding royalty interest has no right to develop the oil or gas, construing preferential rights provisions as applying to these interests does not serve the purpose of preferential rights—namely, the power to exclude undesirable operators or participants.

Implicit in EXCO and Zecchi's argument is the presumption that a preferential right to purchase serves only one purpose. It is correct that

> a preferential right to purchase ensures that the owners retaining their interest in the contract area have some degree of control in excluding undesirable participants who may not have the necessary financial ability to bear their share of expenditures or who might frustrate development with management and engineering philosophies which current owners oppose.[43]

However, this is not the only purpose of a preferential right to purchase:

> In joint operating agreements, each owner believes that the other interests in the subject property are of some value. The preferential right, therefore, assures each owner the opportunity to purchase those valuable rights should a co-owner of an interest decide to sell his interest to a third party. It thus allows those owners, who may have been at risk in exploratory efforts which contributed to the development of the property, to have an opportunity to acquire an additional interest in the property before a third party who did not participate in such risks.[44]

Neither the JOA nor Texas law limits the opportunity to purchase "valuable rights" in the subject property to operating rights. The preferential-right-to-purchase provision in the JOA broadly applies to a party's sale of "its rights and interest in the Contract Area." The parties' amendment showed that the interests Central acquired in the Nebraska properties included overriding royalty interests. Texas Courts of Appeals have held that overriding

---

[43] *Questa Energy Corp. v. Vantage Point Energy, Inc.*, 887 S.W.2d 217, 222 (Tex. App. 1994).

[44] *Id.*

royalty interests are interests in the contract area and that a preferential right to purchase applies to a sale of these interests.[45]

Thus, the only issue here is whether a "sale" of overriding royalty interests occurred. In the context of oil and gas lease interests, Texas courts require an arms-length's transaction between a willing seller and buyer in order to trigger a preferential right to purchase.[46] Because the district court concluded that a preferential right to purchase does not apply to overriding royalty interests, however, it did not determine whether EXCO's transfer of overriding royalty interests to Zecchi constituted an arms-length transaction. Nor did the parties raise this issue to the court in their motions for summary judgment. Thus, we conclude that the matter must be remanded for further proceedings to determine whether the transfer triggered Coral's preferential right to purchase.

### ALLEGATIONS OF FRAUD AND BREACH OF AMENDMENT

In their fifth assignment of error, Coral and KJJ contend that the district court erred in failing to find that Central breached the amendment. This assignment corresponds to Coral and KJJ's claim in their complaint that Central breached the amendment by failing to assist Coral to become the successor operator. Coral and KJJ do not argue, however, how Central failed to assist Coral to become the successor operator. Instead, they argue that the court erred in failing to find that Central breached the JOA by failing to conduct an election for a successor operator. This claim was not presented to the district court.

Similarly, Coral and KJJ make no argument in their brief regarding their third assignment of error: that the district court erred in failing to find that Central, EXCO, and Zecchi committed fraud.

To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued

---

[45] *El Paso Prod. Co., supra* note 35; *IMCO Oil & Gas Co., supra* note 14. See, also, Terry I. Cross, *The Ties That Bind: Preemptive Rights and Restraints on Alienation That Commonly Burden Oil and Gas Properties*, 5 Tex. Wesleyan L. Rev. 193 (1999) (discussing Texas law on this issue).

[46] See *Perritt Co. v. Mitchell*, 663 S.W.2d 696 (Tex. App. 1983).

in the brief of the party asserting the error.[47] An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court.[48] Thus, we do not reach these assignments of error.

## DISCOVERY SANCTIONS

Finally, Coral and KJJ assign that the district court abused its discretion in ordering Coral and KJJ to pay $6,000 in costs and fees for the retaking of a corporate deposition for their failure to produce requested documents before an earlier deposition. The requested documents were relevant to Coral's contention that it was capable of purchasing Central's assets at the time they were sold to EXCO, a requirement under the preferential-right-to-purchase provision.

After a hearing on Central, EXCO, and Zecchi's motion to compel discovery and impose sanctions, including dismissal of the case, the district court found that Coral and KJJ had failed to produce the requested documents until after Central, EXCO, and Zecchi had conducted a deposition of Coral and KJJ pursuant to Neb. Ct. R. of Discovery 30(b)(6) (rev. 2001). The court found the failure was a serious violation of discovery rules but did not warrant dismissal. It therefore ordered a new deposition and costs as a sanction for Coral and KJJ's failure to respond to Central, EXCO, and Zecchi's discovery request before the first deposition.

In December 2004, in connection with the court's order imposing this sanction, Central, EXCO, and Zecchi submitted a motion for payment of costs and fees for the four attorneys representing the defendants at the new deposition. They sought a total of $10,301.53. At a hearing in January, the parties did not submit affidavits detailing their time and rates, but defense counsel for Central, EXCO, and Zecchi submitted invoices from the attorneys' three firms. Counsel for Central stated that his firm had offered to take the deposition in Denver, Colorado, where the deponent resided and the firm was located, and that travel

---

[47] *Worth v. Kolbeck, ante* p. 163, 728 N.W.2d 282 (2007).

[48] *Pohlmann v. Nebraska Dept. of Health & Human Servs.*, 271 Neb. 272, 710 N.W.2d 639 (2006).

expenses were incurred only because Coral preferred to have the deposition taken in Nebraska.

Central's counsel also stated that the actual expense total for the four defense attorneys, based on their hourly rates, was $19,983.53. However, counsel stated that they reduced their collective hourly fee to $125, which they believed to be the prevailing rate for Sidney, Nebraska, to arrive at a total of $8,962.50 plus travel expenses. Counsel also stated that all four attorneys needed to attend in order to effectively represent their respective clients at trial. Central, EXCO, and Zecchi state in their brief that after the hearing, each defense attorney submitted affidavits to the court regarding their fees, but this evidence is not in the record.

Coral and KJJ contend that the order is unsupported because there was no expert testimony regarding local rates and practices or the reasonableness of the time spent in procuring the deposition, and no opportunity to cross-examine witnesses. Central, EXCO, and Zecchi argue that because every defense attorney was present at the hearing on the sanctions, Coral and KJJ had an opportunity to question them, but chose not to do so. Coral and KJJ do not dispute that attorney fees were a permissible sanction for its discovery violation.

 To determine proper and reasonable fees, it is necessary for the court to consider the nature of the proceeding, the time and labor required, the novelty and difficulty of the questions raised, the skill required to properly conduct the case, the responsibility assumed, the care and diligence exhibited, the result of the suit, the character and standing of the attorney, and the customary charges of the bar for similar services.[49] In calculating attorney fees for discovery violations, a court may also use its discretion to exclude excessive or unnecessary work on given tasks.[50]

The invoices submitted by the defense attorneys show that they collectively spent approximately 73 hours preparing or traveling

[49] *Eicher v. Mid America Fin. Invest. Corp.*, 270 Neb. 370, 702 N.W.2d 792 (2005); *In re Guardianship & Conservatorship of Donley*, 262 Neb. 282, 631 N.W.2d 839 (2001).

[50] *Gray v. Lockheed Aeronautical Systems Co.*, 125 F.3d 1387 (11th Cir. 1997).

for the retaking of the Coral and KJJ deposition, at rates ranging from $125 to $310 per hour. Although their affidavits are not in the record, the record does show that Coral and KJJ had the opportunity to present evidence opposing the amount of the award and did not do so.[51]

In *Greenwalt v. Wal-Mart Stores*,[52] this court affirmed a sanction of attorney fees for two attorneys representing one plaintiff in the amount of $5,000 for discovery violations necessitating the moving party to twice file a motion to compel discovery. Here, the district court reduced the requested fees of four attorneys representing three defendants to $6,000 for the retaking of a deposition. The court also denied Central, EXCO, and Zecchi's motion to dismiss the action with prejudice. We conclude that the court did not abuse its discretion.

## CONCLUSION

We conclude that the district court did not err in determining that Central's sale of all of its oil and gas assets fell within the parties' typewritten exception to the preprinted preferential-right-to-purchase provision of their joint operating agreement. We also conclude that the district court did not abuse its discretion in ordering Coral and KJJ to pay attorney fees in the amount of $6,000 as a sanction for failing to produce documents that necessitated the retaking of a corporate deposition. However, we conclude that the district court erred in determining that Coral's preferential right to purchase did not apply to overriding royalty interests and remand the cause for further proceedings on that single issue. The district court's orders of summary judgment are affirmed in all other respects.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

---

[51] See *Winter v. Department of Motor Vehicles*, 257 Neb. 28, 594 N.W.2d 642 (1999).

[52] *Greenwalt v. Wal-Mart Stores*, 253 Neb. 32, 567 N.W.2d 560 (1997).