IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

SEA-HUBBERT FARMS V. HUBBERT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SEA-HUBBERT FARMS, L.L.C., BY AND THROUGH
CLARICE BOSTON, MEMBER, APPELLANT,
V.
KENT C. HUBBERT, APPELLEE.

JOHN BOSTON AND CLARICE BOSTON, APPELLANTS,
V.
KENT HUBBERT AND W & V HUBBERT FARMS
LIMITED PARTNERSHIP, APPELLEES.

Filed April 30, 2013.    Nos. A-12-022, A-12-023.

Appeal from the District Court for Buffalo County: JOHN P. ICENOGLE, Judge. Affirmed.

Siegfried H. Brauer, of Brauer Law Office, for appellants.

Bradley D. Holbrook and Justin R. Herrmann, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., for appellees.

INBODY, Chief Judge, and SIEVERS and RIEDMANN, Judges.

SIEVERS, Judge.

INTRODUCTION

This is the consolidated appeal in two cases from the district court for Buffalo County, Nebraska, which centers around whether the parties to this protracted and complicated litigation entered into a binding settlement agreement. The trial judge found that they did agree to a settlement, and in his journal entry, he set forth five specific things that the parties had to do to complete the agreement that the court found they had made. The appellants claim that the parties never reached an agreement because they never agreed on a "tax avoidance plan" with respect to the transfer of property and the payment of $514,000 to Clarice Boston.

- 1 -

BACKGROUND

Wallace and Valjean Hubbert had three sons, Kent, Kevin, and Keith Hubbert, and one daughter, Clarice. Clarice is now married to John Boston. Clarice and her three brothers are each 25-percent owners of Sea-Hubbert Farms, L.L.C. (SHF). Kent is the managing partner and Clarice is the secretary/treasurer of SHF. The Bostons and the three Hubbert brothers are the owners of JCK Farms, L.L.C. (JCK), with the Bostons having the controlling interest. Also involved in the litigation to a lesser degree is W & V Hubbert Farms Limited Partnership (W&V). These entities are all involved in farming, and the entities, in some instances, farm adjoining land to one another.

On February 22, 1996, the Bostons purchased slightly less than an acre of land with a residence on it from W&V for the sum of $62,800. Included in the written agreement for the purchase was a grant of an easement to the Bostons over and across W&V land for the purpose of maintenance and repair of "the well, the septic tank, and the electric meter." The agreement provides that expenses for the maintenance and repair of this well, located on W&V land, would be split "60/40" between the seller and buyer, respectively. This property became the Bostons' home. Clarice testified that they had unlimited access to the well water for residential use in their home, plus they had paid the electrical costs associated with operation of the well. The well also supplied water to W&V farm ground and to JCK farm ground. With this basic background, we turn to the history of this litigation.

The first of three lawsuits filed in the district court for Buffalo County involving some of the parties and the entities we have mentioned above was filed March 20, 2008. This case was entitled "Sea-Hubbert Farms, L.L.C., by and through Clarice Boston v. Kent C. Hubbert" and designated as "CI-08-192" in the district court. The suit sought an accounting and damages from Kent, the managing partner of SHF.

The second case was filed September 15, 2008, and it was entitled "Sea-Hubbert Farms, L.L.C. v. Clarice Boston and John Boston and JCK, L.L.C.," and designated as "CI-08-643" in the district court. This case alleged that SHF's farm ground had been irrigated by a well located on JCK property but that access to such water was cut off in May 2008 by the Bostons, creating the need for SHF to purchase and sink a new well for irrigation purposes, which SHF wanted the Bostons and JCK to pay for, plus damages were sought for reduced crop yield.

The third case was filed on October 8, 2008, and captioned "Complaint for Temporary Restraining Order, Temporary and Permanent Injunctions." This case was entitled "John Boston and Clarice Boston v. Kent Hubbert and W & V Hubbert Farms Limited Partnership" and designated as "CI-08-715" in the district court. The Bostons alleged that the well discussed above was the only source of water for their home, that Kent had threatened to deny them access to water from the well, and that their purchase agreement gave them a right to such water. The Bostons asked for a temporary restraining order preventing Kent and W&V from depriving them of water from the well. Attached to the complaint was a letter from Kent, the general partner of W&V, dated September 17, 2008, which, among other things, advised the Bostons to stay off of W&V land and stated W&V would cease providing water to their home within 30 days. On October 10, the district court granted the temporary restraining order stopping any threatened termination of the Bostons' water supply from the W&V well and set a hearing for a later date.

The injunction remained in effect, and on December 23, a hearing was held in the district court for the purpose of setting a bond, which the court set at $500.

In all three cases, there were answers, motions, and discovery filed and discovery conducted, which in part make up our transcripts of approximately 500 pages. However, we need not detail that activity because there is no dispute that in October 2010, the parties and their counsel turned from litigation of these cases to a clearly serious effort to settle all three of the cases on the eve of trial. What the parties did in that effort will be discussed in appropriate detail in our analysis section. For purposes of "setting the stage," we believe a fair summary of the desired end result for all parties involved in those cases was that there would be a complete severance of the Bostons from SHF, from W&V, and apparently from the three Hubbert brothers as well. And at the same time, there was to be a severance of the interests of the Hubbert brothers and SHF from JCK. The end result was to be that (1) the Hubbert brothers would own SHF and W&V, (2) the Bostons would own JCK, and (3) Clarice would be paid $514,000. Whether those settlement efforts produced a binding and enforceable settlement agreement is the fundamental question before us.

*District Court Decisions.*

By motions filed in each of the three cases by Kent, or entities that he managed, the district court was asked to enforce the settlement agreement against the Bostons and JCK that Kent alleged had been made on October 11, 2010. The parties and their counsel appeared before the district court on March 8, 2011, for a hearing on the motions for enforcement of the alleged settlement agreement. The trial judge stated that all three cases we have detailed above were before him that day. In simple terms, SHF, W&V, and Kent alleged that the parties had settled all three cases by agreeing that the Bostons would give up any and all interest in SHF and W&V, in exchange for two things: (1) that the Bostons would become the sole owners of JCK and (2) that the Bostons would be paid $514,000. On the other hand, the Bostons claimed that there was only a proposed settlement agreement and that Kent had never agreed to a key element the Bostons required, and thus, there was never an agreement. From the vantage point of the Bostons, this key element, upon which they claim there was never an agreement, was that the mutual transfer of the interests in the involved entities as well as the payment to them of $514,000 would be done in the most advantageous way for them from a tax standpoint in accordance with a tax avoidance or minimization plan developed by their accountant, Michael Main. According to Main's testimony at this hearing, his "plan" was that (1) the Bostons would divest themselves of all ownership rights in SHF and W&V and (2) there would be established an "escrow account" of $514,000 funded by SHF and W&V which would be accessible only by the Bostons for the sole purpose of the Bostons purchasing farm ground, but that Clarice would have to retain some equity interest in SHF to access the escrow account in order for the plan to work. An accountant for SHF testified that he had discussed Main's plan with Main and that in the accountant's opinion, regardless of the contents of documents that might be drafted to portray this as something besides a buyout of the Bostons' interest in SHF, the Internal Revenue Service would simply treat it as a sale and tax any amount over Clarice's basis in the partnerships as capital gain. The evidence suggests that the tax consequence could be in the neighborhood of $50,000.

After this brief trial on March 8, 2011, at which three accountants and Kent testified and numerous documents were placed in evidence, the district court rendered a decision on October 6 in the case entitled "Sea-Hubbert Farms, L.L.C., by and through Clarice Boston v. Kent C. Hubbert" and designated as "CI-08-192." Among the key factual findings of the trial judge was that the parties participated in an effort to settle this case, as well as the other two pending lawsuits. The court found that the Bostons' counsel, Sieg Brauer, drafted a compromise and settlement agreement and forwarded it on October 7 to Bradley Holbrook, counsel for SHF and Kent (who apparently had authority from the other two Hubbert brothers, and thus, generally hereafter, we will use the term Hubbert brothers given their common interest). The court found that Holbrook faxed a responsive letter to Brauer of October 8 outlining partial agreement and a number of counterproposals. Brauer then faxed a handwritten response to Holbrook stating "Brad (Please initial & return) Bostons agree to Hubberts' proposal." On the same page were seven cryptic handwritten and numbered items. However, nowhere in Brauer's fax is it explicitly stated that these seven items are preconditions to a settlement agreement. For example, item 1 simply says "pmt of [$]514,000 however you want to describe." Item 7 states "misc provisions of attached ([not] deleted) will be included (in essence if [not] same lang)." The referenced attachment to the fax was Brauer's original draft agreement from October 7 with paragraphs 4, 5, 6, 8, and a portion of paragraph 9 "deleted" by being crossed out by hand. Brauer's signature and the statement "for John & Clarice Boston" appears at the bottom of the first page of the fax. Within several hours, Holbrook had initialed the fax as requested and sent it back to Brauer.

The Bostons' argument that there was never an agreement revolves around the handwritten item 4 of Brauer's fax which states "agree to Mike Main/Gary Steffenmeier plan to avoid taxation." (We will hereafter usually simply refer to that handwritten item as "#4" unless more detail is required.) The trial court found that section 4, paragraph 3 (again we will generally simply refer to such as "paragraph 3") of Brauer's original typed draft settlement proposal, which paragraph Holbrook had agreed to, provided that the parties would be individually liable for any tax consequences arising out of the transactions necessary to complete the agreement, and the parties individually pledged to cooperate in good faith with each other to make the transfers so as to effect the most "beneficial" tax treatment for each party or entity.

After making the above observations about the agreement, the court then stated the issue was whether "the actions of the parties did in fact result in a settlement agreement executed by counsel." The court found that a settlement that complied with the basic tenets of contract law (to wit: offer, counteroffer, and acceptance) was reached when Holbrook made a settlement offer, which Brauer agreed to, except as stated in Brauer's fax of October 11, 2010, which Holbrook then agreed to by initialing the fax as Brauer had requested. The court found that while thereafter there were "efforts subsequent to the entry of agreement to get greater modification or elaboration, the agreement itself is not ambiguous and may be enforced." As to the tax issue, the court found that the agreement was that Clarice would be responsible for any tax associated with the buyout, although Kent and his associated entities would work with Clarice to develop a tax minimization plan, but she was ultimately responsible for her taxes and was to select a plan that would not be "obstructed by the defendant." The court found that the development of a tax avoidance plan was not a condition precedent to the agreement and that Clarice did not have to develop and accept such a plan before the settlement agreement was formed.

The district court ordered the parties to comply with the settlement agreement within 30 days and made five specifically numbered orders to the parties which we summarize as follows:

1. Clarice shall transfer and assign all rights, title, and interest in SHF to SHF or to the Hubbert brothers "as directed by such individuals."

2. The Hubbert brothers shall transfer all rights, title, and interest in JCK to JCK or to the Bostons "as directed by such individuals."

3. SHF shall pay $514,000 to Clarice.

4. W&V shall undertake its obligation to pay for the installation of a well in the manner and pursuant to the timeframe established by Bauer Well Drilling as more specifically set forth in the settlement agreement.

5. The "parties shall dismiss with prejudice" the above-captioned claims.

Finally, the court's order said that "the settlement agreement, attached as Exhibit A to the motion to enforce is incorporated herein as though fully set forth herein." This decision and order was made in the suit filed in the Buffalo County District Court entitled "Sea-Hubbert Farms, L.L.C., by and through Clarice Boston v. Kent C. Hubbert" and designated as "CI-08-192." A timely motion for new trial was filed and later overruled on December 13, 2011. SHF filed its notice of appeal on January 10, 2012, and we docketed the appeal as our case No. A-12-022.

Also on October 6, 2011, the trial court signed and filed a journal entry in the Buffalo County District Court case entitled "John Boston and Clarice Boston v. Kent Hubbert and W & V Hubbert Farms Limited Partnership" and designated as "CI-08-715," a case which we briefly outlined earlier. In its journal entry in this case, the trial court sustained the settlement enforcement motion "for the reasons set forth in the court's opinion in Case CI-08-192," which we just summarized above. And the court then repeated the same five specific orders from its decision in CI-08-192, plus the court also incorporated "as if fully set out therein" the settlement agreement attached to the motion to enforce as exhibit A. In other words, on the same date, October 6, the trial court ordered the parties in these two cases to perform the settlement agreement, including the five specific directives found in both orders. The Bostons filed a timely motion for new trial in this case, CI-08-715, which was overruled on December 13. The Bostons then filed their notice of appeal of the district court's decision in case CI-08-715 on January 10, 2012, and we docketed that appeal as case No. A-12-023. We have previously ordered the two appeals, cases Nos. A-12-022 and A-12-023, to be consolidated in this court, and thus, it is those consolidated appeals that we now decide in this single opinion.

However, this leaves one of the three Buffalo County District Court cases, the one entitled "Sea-Hubbert Farms, L.L.C. v. Clarice Boston and John Boston and JCK, L.L.C.," and designated as "CI-08-643," unaccounted for. The trial court's decision in this case was initially quite different than that entered in the two other cases. Its journal entry recited that the matter was before the court on the motion of the plaintiff, SHF, seeking to enforce a settlement agreement. The court then simply recited, without the findings or specific orders set forth above that were made in the other two cases, that "[t]he court finds that that agreement having been found to be a valid agreement and enforceable requires the dismissal of these proceedings at such time as the parties have completed their contractual obligations arising from that agreement." On October 14, 2011, the Bostons and JCK filed a motion for new trial, as well as a motion to alter or amend the October 6 judgment. In the later motion, the court was requested to "alter or amend

the judgment consistent with the judgments entered in cases CI-08-192 and CI-08-715." On December 6, the court sustained the motion to alter or amend, stating that the motion to enforce the settlement agreement was sustained "[f]or the reasons set forth in the Court's Opinion in Case CI-08-192," which reasons we have detailed above. The court's journal entry in CI-08-643 orders the parties to comply with the terms and conditions of the "Settlement Agreement" within 30 days. The court then repeats the same five specific orders to the parties which we listed in our summary of the decision in CI-08-192, as well as again providing that the settlement agreement, attached as exhibit A to the motion to enforce, was incorporated as though fully set forth in its journal entry of December 6. The Bostons and JCK then filed another motion for new trial on December 19, pointing out that the trial court had not ruled on its first motion for new trial. On December 20, the trial court found simply that "the Motion for New Trial should be and is denied." On January 18, 2012, the court entered an order setting a supersedeas bond of $500. A notice of appeal in CI-08-643 to this court was filed January 18, 2012, and that case was docketed as case No. A-12-037. However, on March 12, we dismissed that appeal because we concluded it had been filed out of time and that therefore, we lacked jurisdiction. A petition for further review by the Nebraska Supreme Court was timely filed, but was denied on June 27. Our mandate issued on August 16. Thus, the district court's decision in CI-08-643, finding that a settlement agreement had been reached and ordering the performance thereof, became final. In our preargument handling of this appeal, we had left for another day the question of the effect of the fact that the district court's order in district court case CI-08-643, our case No. A-12-037, was final. Thus, we turn to the issue stated immediately below.

*Are Two Pending Appeals Moot Because of Dismissal of*
*Case No. A-12-037, District Court Case CI-08-643?*

The first issue is what effect the finality of the trial court's decision in CI-08-643, if any, has on the two cases now before us in this consolidated appeal. We do note that there was a motion filed, prior to when the trial court tried and decided the three cases, asking that the trial court consolidate all three of these cases. That motion was overruled, and no error is assigned here to that ruling, although it seems clear with the benefit of hindsight, that granting that motion would have been helpful to all concerned, including us.

Nonetheless, the law is clear that an appellate court may take judicial notice of its records, proceedings, and judgments in a prior related case when the issues are "interwoven and interdependent" and the controversy has been considered and determined in the prior action. *Nielsen v. Nielsen*, 13 Neb. App. 738, 700 N.W.2d 675 (2005), citing *Baltensperger v. United States Dept. of Ag.*, 250 Neb. 216, 548 N.W.2d 733 (1996). Clearly, from our recitation of the history of these three cases and appeals, it is obvious that they are "interwoven and interdependent" in many respects, not the least of which is the facts that the district court ultimately issued the same decision and made the same enforcement orders in each case--which happens to now be a final order in one of the three cases. It is that case to which we now turn.

The parties in district court case CI-08-643 were SHF as plaintiff and the Bostons and JCK as the defendants, but none of the Hubbert brothers were named parties. The district court's order entered in CI-08-643, which is final, as previously said, included the following enforcement orders which we summarize for efficiency:

- 6 -

1. Clarice was ordered to transfer all of her interest in SHF to SHF or to the Hubbert brothers as they directed.

2. The Hubbert brothers were ordered to transfer all of their interests in JCK to JCK or the Bostons.

3. SHF was to pay $514,000 to Clarice.

4. W&V was to pay for the well to be installed by Bauer Well Drilling as specifically outlined in the settlement agreement.

5. The parties shall dismiss with prejudice.

Further, the court ordered that "in all other respects," the settlement agreement which the court said was attached as exhibit A to the motion to enforce was incorporated as though fully set forth in the court's journal entry of December 6, 2011.

A case becomes moot when the issues initially presented in the litigation cease to exist, when the litigants lack a legally cognizable interest in the outcome of litigation, or when the issues presented in the case are no longer alive. *Swoboda v. Volkman Plumbing*, 269 Neb. 20, 690 N.W.2d 166 (2004). As such, our inquiry is whether the issues presented by the two appeals now before this court have ceased to exist. Paragraphs 1, 3, and 5 of the district court's order delineate what is to be done to complete the settlement agreement by entities that were parties to case CI-08-643. However, the directives in paragraphs 2 and 4 require that W&V, as well as the Hubbert brothers, perform certain obligations in order to complete the settlement agreement--but neither W&V nor the Hubbert brothers were parties in case CI-08-643. Accordingly, it is clear that the trial court had no jurisdiction, i.e., power, given the absence of consolidation, to order them, as nonparties to the case, to do anything because the court did not have personal jurisdiction over them. Personal jurisdiction is the power of a tribunal to subject and bind a particular entity to its decisions. *Hunt v. Trackwell*, 262 Neb. 688, 635 N.W.2d 106 (2001). Consequently, the finding of a valid settlement agreement, as well as the orders of enforcement in case CI-08-643 which are now final orders, does not resolve all the issues before us in the present consolidated appeal because there are parties in these two pending appeals that were not parties to case CI-08-643. For example, the Hubbert brothers were ordered to perform certain actions in CI-08-643, although they were not parties to that case. Put another way, as a general proposition for the now final decision to moot these two pending appeals, the parties would have to be the same in all three cases. But, they are not, and therefore, the instant appeals are not moot. We now turn to the merits of the present consolidated appeals.

ASSIGNMENTS OF ERROR

The Bostons assign that the district court erred in (1) finding that there was an enforceable settlement agreement; (2) giving effect to a general provision, paragraph 3, regarding tax consequences rather than to a specific provision, the handwritten #4 of the October 11, 2010, Brauer fax; (3) finding that Clarice was "obligated to select a [tax avoidance] plan most beneficial to her that was not obstructed by the [appellees]"; and (4) finding that the settlement agreement "merely provides that the defendant would cooperate in the development of a plan, but requirement exist that a plan be accepted by Clarice . . . before the settlement agreement was effected." (We note for the reader's understanding that while the trial court's quoted phrase in

the assignment of error appears not to make sense, the assignment correctly quotes the court's finding.)

## STANDARD OF REVIEW

A settlement agreement is subject to the general principles of contract law. *Fleming Co. of Nebraska v. Michals*, 230 Neb. 753, 433 N.W.2d 505 (1988); *Omaha Nat. Bank v. Mullenax*, 211 Neb. 830, 320 N.W.2d 755 (1982). In a bench trial of an action at law, the factual findings by the trial court have the effect of a jury verdict and will not be set aside unless they are clearly wrong. *Fleming Co. of Nebraska v. Michals, supra.*

## ANALYSIS

The fundamental issue is simply whether the attorneys for the parties reached a binding and enforceable settlement agreement with respect to the three lawsuits that we have previously detailed in our opinion. We note that neither party advances any claim that counsel did not have appropriate authority to settle the cases and enter into a settlement agreement on behalf of their respective clients. We believe that well-established and clear principles of contract law lie at the heart of our analysis. We begin by quoting at some length from the Supreme Court's opinion in *Logan Ranch v. Farm Credit Bank*, 238 Neb. 814, 822-23, 472 N.W.2d 704, 709 (1991):

> The Restatement (Second) of Contracts § 58 at 144 (1981) states: "An acceptance must comply with the requirements of the offer as to the promise to be made or the performance to be rendered." An acceptance that is materially different does not comply with the requirements of the offer.
>
> In *Rybin Investment Co., Inc. v. Wade*, [210 Neb. 707, 316 N.W.2d 744 (1982)], this court found that acceptance of an offer must be an unconditional acceptance of the offer as made, otherwise there is no contract formed. Where the acceptance differs from the offer and is coupled with any condition that varies or adds to the offer, it is not an acceptance; rather, it is a counteroffer. See Restatement (Second) of Contracts § 59 (1981). (The Restatement states that "[a] reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer." *Id*. at 145.)
>
> The court in *Rybin Investment Co*. continued, finding that where one to whom an offer has been made makes a counteroffer of different terms and conditions, the counteroffer is in reality a rejection of the original offer. See, *Griggs v. Oak*, 164 Neb. 296, 82 N.W.2d 410 (1957); *Farmers Union Fidelity Ins. Co. v. Farmers Union Co-op. Ins. Co.*, 147 Neb. 1093, 26 N.W.2d 122 (1947).
>
> In *Anderson v. Stewart*, 149 Neb. 660, 32 N.W.2d 140 (1948), this court found that a purchase agreement with a condition connected to the acceptance was not enforceable. The buyer sent back an acceptance of the offer which stated that the seller had to send the deed to a certain bank in order to receive the purchase price. The court held that this was not an unconditional acceptance. The court stated: "The acceptance of an offer to buy or sell real estate must be an unconditional acceptance of the offer as made; otherwise no contract is formed. . . . If the acceptance differs from the offer or is

coupled with any condition that varies or adds to the offer, it is not an acceptance, but is a counterproposition. . . .”

From these general legal principles, we use the analytic rubric of “offer, counteroffer, and acceptance” to resolve the core issue. And, with respect to the parties' basic intent, we bear in mind that the parties were on the eve of a major trial at the time of the pertinent events.

*First Offer--Brauer's Letter and Attachments*
*of October 7, 2010.*

Brauer wrote a 3½-page, single-spaced letter to Holbrook on October 7, 2010, that begins:

I note a caveat that . . . Main is working on at this time. He is assessing the options of placing any payment to Clarice in escrow. Any like-kind transaction would apparently require any cash payment to be held in the name of [SHF] until a land purchase transaction could be effected and the payment be made directly out to the seller (or [R]ealtor). This proposal is for your parties to give consideration to the cost issue and remains contingent on the method [Main] informs will be needed to protect against tax confiscation of resources. It may be necessary to craft an agreement regarding the transfer of the settlement proceeds in a way that [SHF] will participate as a named interested party.

The letter is clear that the offer is to resolve all three pending cases, but in large part the letter is simply advocacy about the merits of the offer Brauer is tendering to Holbrook and how the dollars and cents were calculated. Brauer set forth a breakdown of the monetary aspects of the Bostons becoming sole owners of JCK and Clarice surrendering her interest in SHF. His proposal provided that SHF would pay Clarice $587,730; the Bostons would pay the Hubbert brothers $119,281.26; and Kent would pay Clarice $50,543. After adding and subtracting, the end result was that Clarice (and John) would net $518,991.74 under Brauer's settlement offer of October 7, 2010.

Attached to Brauer's letter was an unsigned proposed “Compromise and Settlement Agreement” which did not contain any language making the offer contingent on Main's tax avoidance plan as stated at the outset of the letter, nor was a “Mike Main plan” mentioned whatsoever in Brauer's proposed settlement agreement that he tendered to Holbrook. In its form and content, Brauer's proposed “Compromise and Settlement Agreement” is a complete settlement. Importantly, this document included paragraph 3 that Brauer authored, and which stated:

All parties or entities shall be liable for any tax consequences arising out of any actions taken under this agreement that attach to the property received by such parties or entities, respectively, and all parties or entities to this agreement will cooperate in good faith to aid and assist in legal transfers of such interests that will effect the most beneficial tax treatment to each such receiving party or entity.

*Holbrook's Faxed Responsive Letter of October 8, 2010,*
*Is Rejection of Brauer's Offer and Is Counteroffer.*

There is no question that Holbrook's response is a rejection and a counteroffer. In the first paragraph of his October 8, 2010, letter Holbrook mentions that after discussion with the three Hubbert brothers, "I have been authorized to extend the following offer." The letter states that Brauer's condition that the Hubbert brothers pay for the cost of drilling a new well for the Bostons is rejected. Holbrook's letter devotes two paragraphs to disputing the accuracy of Brauer's calculation that would net $518,991.74 to the Bostons. And he offers that Clarice would receive JCK property and that the Hubbert brothers "and/or their entity" would receive Clarice's interest in SHF of $445,298.74 to which $50,000 would be added "as boot" for a total payment to Clarice (and John) of $495,298.74. Additionally, Holbrook adds a new proviso which is that SHF would receive a right of first refusal if the Bostons choose to sell or otherwise transfer the JCK property. The final requirement in Holbrook's letter is that he "draft the settlement agreement."

The applicable law from *Rybin Investment Co., Inc. v. Wade*, 210 Neb. 707, 316 N.W.2d 744 (1982), is that where the acceptance differs from the offer and is coupled with any condition that varies or adds to the offer, it is not an acceptance; rather, it is a counteroffer. Here, there is a rejection of a number of portions of Brauer's offer, a counteroffer of a lesser sum of money, and a new material condition was put on the table--the right of first refusal in the event of a sale of the JCK land. Accordingly, at the end of the day on October 8, 2010, there was no settlement agreement for the three pending lawsuits, because Holbrook had rejected Brauer's original proposal. That rejection necessarily included rejection of the provision contained in Brauer's letter quoted above that sought to make the settlement "contingent on the method [Main] informs will be needed to protect against tax confiscation of resources," and as noted, Brauer did not include any such contingency in his draft proposed settlement agreement. Thus, we find that the first paragraph of Brauer's letter to Holbrook, to the extent it set forth a contingency, has been abandoned or superseded. In the end, as of October 8, as explained in *Rybin Investment Co., Inc. v. Wade, supra*, there was an outstanding counteroffer from Holbrook via his letter of October 8 on behalf of the Hubbert brothers to the Bostons' counsel, Brauer.

*Brauer's Handwritten Fax With Attachments*
*of October 11, 2010, in Response to*
*Holbrook's Letter of October 8.*

The evidence does not show a response to Holbrook's counteroffer until October 11, 2010, when Brauer sent a handwritten fax to Holbrook at 1:05 p.m. It begins: "(Please initial & return) Brad[,] Bostons agree to Hubberts' proposal." Brauer then lists on the same page seven handwritten items which we quote as they were written:

> 1. pmt of [$]514,000 however you want to describe
> 2. install domestic well thru Bauer Well Drilling
> 3. rt 1st refusal for continuation of farming on JCK 80
> 4. agree to Mike Main/Gary Steffenmeier plan to avoid taxation
> 5. dismiss all pending actions w/ prejudice
> 6. parties pay own atty fees & costs

7. misc provisions of attached ([not] deleted) will be included (in essence if [not] same lang)

Brauer has signed the fax "for John & Clarice Boston." And the record shows that approximately 2 hours later, Holbrook initialed Brauer's fax and faxed it back to Brauer. Brauer's fax of October 11 is clearly a counteroffer because it implicitly rejects Holbrook's previously proposed cash payment of $495,298.14 by expressly stating that the cash payment portion of the settlement would be $514,000. Additionally, Holbrook had previously proposed that the settlement include the proviso that if the Bostons sold or otherwise transferred the JCK land, that his clients would have a right of first refusal. However, Brauer's October 11 fax implicitly rejects that proposal and makes a counteroffer in that regard by saying that the Bostons will merely give a right of first refusal "for continuation of farming on JCK 80," which we read to mean that SHF and/or the Hubbert brothers get the "first shot" at continuing to be the tenant farmer on an 80-acre tract owned by JCK. But, the Hubbert brothers would have no right of first refusal if the JCK land is to be sold. Thus, Brauer's October 11 fax to Holbrook becomes a counteroffer from the Bostons. That counteroffer, in summary, is that the Bostons agree to Holbrook's October 8 proposal, except that there are seven handwritten qualifications to the acceptance. But it is crucial to note that Brauer's counterproposal via his October 11 fax included the attachment of a copy of all but the signature pages of Brauer's original "Compromise and Settlement Agreement" that he had sent to Holbrook with his letter of October 7. And item 7 of Brauer's October 10 counterproposal was that "misc provisions of attached ([not] deleted) will be included (in essence if [not] same lang)." And in the attachment sent to Holbrook, Brauer has crossed out (deleted) paragraphs 4, 5, and 6 as well as portions of paragraphs 8 and 9. Accordingly, the attachment became part of Brauer's counteroffer.

As indicated above, approximately 2 hours later, Holbrook initialed the first page of Brauer's fax (which had the seven handwritten items on it) as he was requested to do, and he faxed it back to Brauer with no qualifications, additions, or different conditions. Therefore, we conclude that when Holbrook initialed Brauer's faxed counteroffer and sent it back to Brauer, a settlement agreement of the three pending lawsuits had been reached between the parties acting through their attorneys. This was the district court's factual conclusion, and it was not clearly erroneous. We note that whether a binding agreement has been reached is ordinarily a question of fact. *Viking Broadcasting Corp. v. Snell Publishing Co.*, 243 Neb. 92, 497 N.W.2d 383 (1993).

To have a settlement agreement, there must be a definite offer and an unconditional acceptance. *Heese Produce Co. v. Lueders*, 233 Neb. 12, 443 N.W.2d 278 (1989). Mutual assent to an agreement is determined by the objective manifestations of intent by the parties, not by their subjective statements of intent. See *Viking Broadcasting Corp. v. Snell Publishing Co., supra.*

There can be little doubt that Brauer's fax of October 11, 2010, is a counteroffer. The Restatement (Second) of Contracts § 24 at 71 (1981) defines an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." This aptly describes Brauer's fax of October 11, which clearly therein conveyed a "willingness" to end the litigation by settlement.

Clearly, Holbrook unconditionally accepted and assented to the bargain that Brauer offered via his fax on October 11 by simply initialing the fax as Brauer requested that he do.

The Bostons' position, summarized, seems to be that while conceding that there was a "skeletal agreement" (to use their counsel's descriptor) reached on October 11, 2010, see brief for appellants at 11, there was to be a tax avoidance plan later developed by Main, and that the transfer would occur in accordance with the "Main plan." To phrase it another way, the Bostons assert that despite the "skeletal agreement" which was reached on October 11, one term thereof, the tax avoidance plan, was not sufficiently definite as required by *Heese Produce Co. v. Lueders, supra*. Thus, the Bostons claim that no enforceable agreement whatsoever came into existence.

The Bostons' argument centers on handwritten #4 in Brauer's counteroffer of October 11, 2010, stating "agree to Mike Main/Gary Steffenmeier plan to avoid taxation." Holbrook, by initialing the fax without qualification, has agreed to #4, although at that point in time there was no such joint plan, and in fact, Main had not even articulated the terms of his own plan at that time. Therefore, the issue now becomes whether the tax avoidance component, the details of which were then unknown or, at best, uncertain, operates to prevent the formation of any binding settlement agreement whatsoever. And when addressing this question, we must bear in mind that what was agreed to on October 11 includes Brauer's original "Compromise and Settlement Agreement" with Brauer's deletions *and* Brauer's October 11 handwritten fax. In other words, the import of the tax avoidance language in the settlement agreement is derived from both documents viewed together.

At oral argument, the Bostons' counsel argued vigorously that #4 was nothing but "an agreement to agree" and that thus there could be no settlement agreement. Holbrook countered with the argument that Brauer was arguing about "performance issues, not agreement issues." In our view, the Bostons' argument wrongly looks at #4 in isolation. See *Bedrosky v. Hiner*, 230 Neb. 200, 204, 430 N.W.2d 535, 539 (1988) ("party may not pick and choose among the clauses of the contract, accepting only those that advantage it"). Significantly, it has been said that whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses. *Poulton v. State Farm Fire & Cas. Cos.*, 267 Neb. 569, 675 N.W.2d 665 (2004). Attempting to determine and articulate what the parties were bound to do by looking at handwritten #4 alone is not possible. However, paragraph 3 of Brauer's original "Compromise and Settlement Agreement" gives the handwritten #4 meaning, and the two paragraphs must be read together, as well as being read in conjunction with the fundamental goals and methodology of what the parties agreed to do to resolve their differences. Those precepts, reduced to their essence, are quite straightforward: the Hubberts are getting out of JCK, the Bostons are getting out of SHF, and Clarice was being paid $514,000. That Clarice would not have to pay income tax on the $514,000 was not a condition of the transaction. Rather, the agreement was that if it could be done, the transfers of ownership and money would be done in a way that was most beneficial from an income tax avoidance standpoint. Clarice appears to believe that we simply assume that there was a legal way for her to avoid taxation on this transaction and still make the transfers of ownership that the agreement clearly requires her to do, doing so within a reasonable time period. With respect to the "time period" involved, the agreement arrived at between Brauer and Holbrook does not have a timeframe for completion.

Thus, the applicable law is that "in the absence of a stated time for performance, the law will imply a time of performance within a reasonable time under the circumstances." *Davco Realty Co. v. Picnic Foods, Inc.*, 198 Neb. 193, 199, 252 N.W.2d 142, 147 (1977). Thus, the applicable timeframe to formulate a tax avoidance plan and complete the transfers is a "reasonable" amount of time. Given the obvious hostility of the parties toward each other, that timeframe would be "sooner rather than later."

While the parties did agree to do the transfers in a way to effect the "most beneficial tax advantage" to each receiving party, what that actually meant has limits. One such limitation is that there is an implied covenant of good faith and fair dealing in every contract which requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract. *Reichert v. Rubloff Hammond, L.L.C.*, 264 Neb. 16, 645 N.W.2d 519 (2002). In that context, there was never a "Mike Main/Gary Steffenmeier plan to avoid taxation," only a plan by Main which the evidence shows the Hubbert brothers would not agree to because it required that Clarice would continue to have an ownership interest in SHF. Obviously, the Main plan would deprive the Hubbert brothers and SHF of the benefit of their fundamental bargain that she would be completely "out" of the business affairs of the Hubbert brothers and SHF. And, of course, there is the additional problem that the Main plan was not a "Mike Main/Gary Steffenmeier plan."

As we earlier pointed out, the need to later develop and execute effectuating documents does not prevent the formation of a binding contract. The evidence was that both sides' accountants agreed that a "like-kind" exchange under the Internal Revenue Code, I.R.C. § 1031 (2006), would not work. Main then developed his own plan which, summarized, would require the Hubbert brothers and SHF to place $514,000 in an escrow account, for SHF to buy land of Clarice's choice with those funds, and then the land would be transferred to her in lieu of the $514,000 cash. The "rub" was that Clarice would need to maintain an equity interest in SHF which caused the Hubbert brothers to reject the Main plan. Moreover, there was evidence from the Hubbert brothers' accountant at the trial on the enforcement motions that regardless of what documents or structure was used, such an attempt to camouflage what was in reality a buyout of a capital asset would not work, and that the Internal Revenue Service would simply tax Clarice on her capital gain between her basis of approximately $360,000 in SHF and the $514,000 that she was getting in the settlement. Main's plan would also violate the implied covenant of good faith and fair dealing because it would deprive SHF and the Hubbert brothers of their bargain--which was that Clarice would no longer have any interest in or "say-so" whatsoever in the affairs of SHF and the three Hubbert brothers. Therefore, in the end, the evidence was that there was no tax avoidance plan that was consistent with the main intent of the parties. However, that fact does not prevent the enforcement of the balance of the agreement. See, *Poulton v. State Farm Fire & Cas. Cos.*, 267 Neb. 569, 675 N.W.2d 665 (2004) (whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses); *Bedrosky v. Hiner*, 230 Neb. 200, 204, 430 N.W.2d 535, 539 (1988) ("party may not pick and choose among the clauses of the contract, accepting only those that advantage it"). See, also, *Edwards v. Edwards*, 16 Neb. App. 297, 744 N.W.2d 243 (2008). Our case law has made it clear that contract provisions may be severable. See, e.g., *Gaspar v. Flott*, 209 Neb. 260, 307 N.W.2d 500 (1981). In *Gaspar v. Flott, supra*, the court cited *Reichert v. Mulder*, 121 Neb. 11,

235 N.W. 680 (1931), for the proposition that whether a contract is severable is a question of intentions apparent in the instrument. And *Reichert v. Mulder, supra*, teaches that in an unambiguous contract, severability is determined from the language, the subject matter, and the construction placed upon it by the parties in light of the surrounding circumstances. The *Gaspar* opinion noted that *Reichart v. Mulder, supra*, is probably the "last word" on the issue when it "forthrightly states" that "'[a] contract which in its nature and purpose is susceptible of division and apportionment is divisible and severable.'" 209 Neb. at 264, 307 N.W.2d at 503. In our situation, while there is no severability clause, paragraph 3 is clear and unambiguous that everybody pays their own taxes. And while they agree to a good faith effort to avoid taxes, there is no express intention that the "deal" is contingent on Clarice's being able to avoid income tax--a simple matter to put in the contract if the entire arrangement was dependent on such fact, rather than by the clear language of the parties that they agree merely to attempt in good faith to avoid taxes. There is no evidence or claim made by Clarice that SHF and the Hubbert brothers did not live up to that promise. The simple fact is that the Hubbert brothers' accountant did not think the Main plan would work, and in any event, it would frustrate the purpose of the agreement which at its core was to effectively "divorce" the parties from one another.

That being said, it goes without saying that if in the course of performance of the agreement as ordered by the district court, the parties could agree on a tax avoidance plan, consistent with the core tenants of the settlement agreement, nothing prevents them from using such plan.

In fairness we should "backtrack" a bit because the Bostons call our attention to a number of letters between Holbrook and Brauer after October 11, 2010, over a period of several months that dealt with (1) what was the so-called tax avoidance plan to be and (2) when and how the "settlement agreement" would be formalized. These letters touched on what exactly Main's plan was, how it would work, and how long the Bostons would have to farm the land that SHF was to buy and transfer to the Bostons under his proposed plan. From the Hubbert brothers' standpoint, Holbrook articulated his clients' objection that Main's plan ran counter to the fundamental tenet of the settlement agreement that Clarice would be completely "out" of SHF because the Main plan required that Clarice would continue to have an equity interest in SHF.

The Bostons argue that all of this "back and forth" between counsel about the Main plan shows that there was a material term or condition of the settlement that was never agreed to and that thus, no enforceable settlement agreement whatsoever came into existence. We find that the "back and forth" between the two attorneys after October 11, 2010, were merely attempts at elaboration or implementation of #4 and paragraph 3 that ultimately failed. A contractual provision to execute effectuating documents in the future is enforceable where all of the material terms are specified in the original contract and leave none to be agreed upon through future negotiations. See *Strategic Staff Mgmt. v. Roseland*, 260 Neb. 682, 619 N.W.2d 230 (2000).

In *Satellite Dev. Co. v. Bernt*, 229 Neb. 778, 429 N.W.2d 334 (1988), a property seller argued that a purchase agreement was not a binding contract because a paragraph in the agreement required that a future contract be made with respect to a second mortgage but the court found that the evidence did not show that the second contract was a precondition to performance under the purchase agreement, but, rather, the second contract was only an elaboration on the terms of the purchase agreement. Therefore, because the purchase agreement

was controlling, the Supreme Court concluded that the sellers were bound and had to perform despite their refusal to execute a second contract for a second mortgage that was part of the transaction. *Id*. This is the exact situation we have here with respect to tax avoidance provisions of the agreement. It seems to be self-evident that if the reality in the present situation is that there is no legal way for Clarice to avoid taxation, and at the same time do the transfers she clearly agreed to within a reasonable time, that paragraph 3 and #4 are simply unenforceable parts of the agreement; however, such fact does not prevent enforcement of the rest of the agreement.

In *Strategic Staff Mgmt. v. Roseland, supra*, the court noted that it would have been a simple matter for the parties to the memorandum of agreement to provide that certain terms would be agreed upon later or that the terms of the memorandum of agreement would not take effect until the general release was executed if that had been their intent. Likewise, in this case, the Bostons could have specified that their counteroffer of October 11, 2010, via Brauer's fax, was contingent upon the development of a tax avoidance plan by Main to which the Hubbert brothers and SHF would agree. But, the agreement did not so provide, and we cannot rewrite the agreement to include such a contingency. Clearly, what would constitute the "Mike Main/Gary Steffenmeier plan to avoid taxation" falls in that category of "further elaboration" that was said in *Satellite Dev. Co. v. Bernt, supra*, not to prevent the formation of a binding agreement.

In *Coral Prod. Corp. v. Central Resources*, 273 Neb. 379, 391-92, 730 N.W.2d 357, 369 (2007), the court said:

> An appellate court must examine and consider the writing as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. A court presumes the parties to a contract intend every clause to have some effect. No single provision taken alone will be given controlling effect; rather, all provisions must be considered with reference to the whole instrument.

The court in *Coral Prod. Corp. v. Central Resources, supra*, also noted that a court's primary concern in interpreting a contract is ascertaining the true intent of the parties. These rules of contractual interpretation naturally take us to the typewritten paragraph 3 that Brauer put in his original "Compromise and Settlement Agreement" sent to Holbrook on October 7, 2010, and which remained in Brauer's counteroffer of October 11 and which Holbrook accepted unconditionally on that same date. Paragraph 3 provides:

> All parties or entities shall be liable for any tax consequences arising out of any actions taken under this agreement that attach to the property received by such parties or entities, respectively, and all parties or entities to this agreement will cooperate in good faith to aid and assist in legal transfers of such interests that will effect the most beneficial tax treatment to each such receiving party or entity.

Paragraphs 1 and 2 immediately preceding the above-quoted paragraph contain the heart of the settlement, which is that Clarice will transfer all of her interest in SHF to the Hubbert brothers or SHF and that in turn, the Hubbert brothers will transfer their interest in JCK to Clarice--thus, the reference in paragraph 3 to "transfers." The Bostons' brief refers to the rule of contract construction that specific terms control over general terms and cites to *Panwitz v. Miller Farm-Home Oil Service*, 228 Neb. 220, 422 N.W.2d 63 (1988) (reciting that proper rule of construction is that more specific term of contract will control over general provision of contract

as it relates to same subject matter). The Bostons argue that paragraph 3 is the general term, whereas the handwritten #4 is the specific. The Bostons' argument asserts that the general paragraph 3 does not vitiate the #4 of Brauer's fax "requiring the parties to 'agree' to the as yet undefined . . . Main 'plan'" and that paragraph 3 was merely "boilerplate" language that required each party to be responsible for their own taxes from the transfer. Brief for appellants at 18. Several shortcomings are apparent in this attempt to use the "specific over the general rule." First, paragraph 3 is more specific than #4 because it has certainty and clarity. It provides that everybody pays their own taxes, but imposes a duty to act in good faith to help each other gain the "most beneficial" tax treatment, obviously avoidance of taxation, flowing from the settlement. In contrast, #4 from the fax is generalized to the extreme because on October 11, 2010, there was not then any "Mike Main/Gary Steffenmeier plan to avoid taxation." And the evidence shows that no such joint plan ever existed because while Main developed his own plan, the Hubbert brothers' accountant did not agree that such plan would avoid taxation. It is noteworthy that in neither the trial court nor in this court do the Bostons seek specific performance of the Main plan; rather, they seek to avoid the entire settlement.

Accordingly, we conclude that paragraph 3 is the specific tax avoidance plan provision which contemplated a plan mutually devised and agreed to by the two sides' accountants, as well as good faith cooperation by the opposing parties to implement such in the course of making the transfers. And, it is important to observe that the Bostons introduced no evidence of any lack of good faith on the part of the Hubbert brothers, nor do they argue that the Hubbert brothers did not act in good faith after October 11, 2010, with respect to tax avoidance. And, the trial court's order, which incorporated the "Compromise and Settlement Agreement" as it existed after Brauer's interlineation, binds the parties to perform according to paragraph 3. Thus, the duty to cooperate to avoid taxes found in paragraph 3 remains viable. We do wish to make it clear that whether the Main plan is within the ambit of paragraph 3 is not before us, and we make no comment on that matter, direct or implied.

*Did Trial Court Err in Finding That Clarice Was Obligated to*
*"select a plan most beneficial to her that has not be*[*en*]
*obstructed by the* [*Hubbert brothers*]*?"*

In support of this assignment of error, which we have restated as a question, Clarice argues that she did not agree to a plan that the Hubbert brothers did not obstruct, but, rather, "a plan designed by . . . Main and not objected to by appellees' tax accountant." Brief for appellants at 3. Clarice's current formulation of what she agreed to, and that is quoted in the foregoing sentence, is remarkable because while it is very specific, readily understandable, and seemingly workable, it is language not found in #4 or paragraph 3, both of which were drafted by her counsel. But, it really is not any different in meaning than the court's language. If the Hubbert brothers' accountant objected to Main's plan, in the final analysis such plan would in all likelihood be "obstructed" by the Hubbert brothers--the word the district court chose to use in its explanatory portion of its decision. The language used by the court is merely descriptive of the effect of what the parties had agreed to in #4 and paragraph 3. The court did, however, make five specific orders of what the parties had to do to complete the settlement agreement. Although it is argued that by this sentence the court has inserted language into the agreement that the parties

did not use, we look to what the court ordered rather than the language used in the explanation of findings that precedes its orders to the parties. Even if the court's word choice was not perfect in the sentence Clarice now objects to, it is a "no harm-no foul" situation because it was not part of the court's order.

Clarice's final assignment of error deals with language found in the trial judge's order in case No. A-12-022, which states:

> The development of a plan to avoid taxation is not a condition precedent in this matter in that the settlement agreement merely provides that the defendant would cooperate in the development of a plan but [**no**] requirement **exist**[**s**] that a plan be accepted by Clarice . . . before the settlement agreement was effected [**effective**].

The Bostons' counsel says the sentence is not understandable, which is true to a degree. However, we find that the sentence merely suffers from the lack of a close proofreading. That said, we have "proofread" the sentence in light of the entire order in this case, as well as the final orders in the other two interrelated cases. From that exercise, the necessary editing is obvious, and we have inserted and bolded the edits that the sentence clearly needs. After doing so, the sentence makes sense and is entirely consistent with the court's other findings and ultimate resolution of the cases. The rest of the arguments concerning this fourth assignment of error are merely repetition or restatement of arguments we have already dealt with and rejected.

## CONCLUSION

The trial court made a factual finding that the parties had entered into a binding settlement agreement through their attorneys of all three of the district court cases we have discussed in our opinion. Our standard of review is whether the factual finding that the parties settled these cases on October 11, 2010, is clearly erroneous, and we cannot say that it is. The district court's order requires them to do the things they agreed to do and to perform the terms of their agreement which the court found is reflected in exhibit A to the Hubberts' and SHF's motion for enforcement. Therefore, we affirm the trial court's decision in all respects.

AFFIRMED.